# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
GERRI CHERRY,                   )
Personal Representative of the  )
Estate of Alonzo Smith, Deceased, )
                                )
              Plaintiff,        )
                                )
      v.                        )    Civil Action No. 17-2263 (ABJ)
                                )
DISTRICT OF COLUMBIA, et al.,   )
                                )
              Defendants.       )
_____)
```

## MEMORANDUM OPINION

This case arises from the death of Alonzo Smith, who died of cardiac arrest when he was arrested by two special police officers ("SPOs"). Plaintiff Gerri Cherry, the personal representative of Smith's estate, filed suit against the SPOs, the security company that employs the officers, the property manager and the owner of the apartment complex that hired the firm, and the District of Columbia ("the District"). *See* Compl. [Dkt. # 1]. The complaint alleges that the SPOs used excessive force when they forcefully restrained Smith face down on the ground with two sets of handcuffs, and that this prevented him from breathing and caused his death. *Id.* ¶¶ 55–60. Plaintiff claims that the SPOs violated Smith's Fourth Amendment rights, and that the District is liable under 42 U.S.C. § 1983 for failing to adequately train them. *Id.* The complaint also includes a wrongful death claim and a survival action against all defendants based on negligence. *Id.* ¶¶ 61–77.

The District has moved to dismiss plaintiff's claims against it for failure to state a claim, and this opinion deals with those claims only. *See* Def. District of Columbia's Mot. to Dismiss the Compl. [Dkt. # 22] ("Def.'s Mot."). The Court will grant the District's motion to dismiss the

section 1983 claims because the complaint fails to allege sufficient facts to establish municipal liability in accordance with the Supreme Court's decision in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Further, the Court will dismiss the negligence claims under the Wrongful Death Act and the Survival Act because the District is entitled to discretionary function immunity.

## BACKGROUND

### I.     The Role of Special Police Officers

The Mayor of the District of Columbia, in his or her discretion, may appoint an SPO in connection with the property of, or under the charge of, a corporation or individual. D.C. Code § 5-129.02(a). A corporation or individual may also apply for such an appointment. *Id.* SPOs are "paid wholly by the corporation or person on whose account their appointments are made," and they are required "to complete minimum levels of pre-assignment, on-the-job, and in-service training." *Id.* 5-129.02(a)–(b).

According to the complaint, SPOs Ramon Vega and Alonzo Wilson were commissioned by the Mayor pursuant to D.C. Code § 5-129.02 to "ensure the safety and security of the premises located at Marbury Plaza Apartments." Compl. ¶¶ 4–6. Plaintiff alleges that SPOs "have the same powers as law enforcement officers to arrest without warrants for offenses committed within premises to which their jurisdiction extends." *Id.* ¶ 4.

The complaint alleges that prior to November 1, 2015, all SPOs were required to undergo forty hours of pre-assignment training in a course "designed by and promulgated by" the District.[1] Compl. ¶ 24. Sixteen hours of pre-assignment training were dedicated to training on arrest powers, search and seizure, the D.C. official code, and the use of force, and twenty-four hours of training

---

1       Plaintiff's complaint alleges that after November 1, 2015, the District increased the requirement to eighty hours of training, which includes specific training on the use of force, restraint techniques, and positional asphyxia. Compl. ¶ 27.

focused on terrorism awareness, evacuation protocols, and first aid. *Id.* ¶ 25. All training materials regarding the use of force that were supplied to the SPOs were prepared and provided by the District. *Id.* ¶ 28. Additionally, SPOs received sixteen hours of on-the-job training during their first ninety working days. *Id.* ¶ 26.

## II. The Events of November 1, 2015

On November 1, 2015, at approximately 3:10 A.M., Alonzo Smith came out of the Marbury Plaza Apartments building located at 2300 Good Hope Road, S.E., Washington, D.C. 20020. Compl. ¶¶ 5, 32. Smith, who was not wearing a shirt or shoes, was visibly in distress and yelling for help. *Id.* ¶ 32.

At approximately 3:30 A.M., SPO Vega reportedly saw Smith hiding in some bushes in the grassy area of the apartment complex and radioed SPO Wilson for assistance. Compl. ¶ 33. The SPOs followed Smith as he "frantically" ran around the apartment building and a neighboring parking lot. *Id.* ¶ 34. SPO Wilson then followed Smith as he entered a building located at 2312 Good Hope Road and attempted to climb the fire escape. *Id.* ¶ 35. When the SPO caught up to Smith, the SPO allegedly grabbed him, "restrained him in a choke hold, slammed him onto the ground . . ., and forcibly restrained" him. *Id.* ¶ 37. When SPO Vega arrived, SPO Wilson was straddling Smith, who was on his stomach, face down. *Id.* ¶ 38. According to the complaint, SPO Wilson put his knee on Smith's back and attempted to handcuff him, while also asking SPO Vega for his set of handcuffs. *Id.* SPO Vega then held Smith's head down to the ground while he linked his handcuffs to SPO Wilson's set, thereby restraining Smith with two sets of handcuffs. *Id.* ¶ 39.

Metropolitan Police Department ("MPD") officers Kevin Fitch and Esteban Alvarez also responded to the incident, and upon their arrival, they found Smith motionless, lying face down on the ground with his arms handcuffed behind him. Compl. ¶ 42. The MPD officers asked SPOs

Wilson and Vega whether Smith was breathing. *Id.* ¶ 43. The SPOs checked to see if he was, and when they realized that he was not, they began to administer CPR while Smith was still handcuffed. *Id.*

Smith was transported to United Medical Center and was pronounced dead at 5:08 A.M. Compl. ¶ 44. On the following day, November 2, 2015,[2] Sasha Osbourne, M.D., performed an autopsy and ruled Smith's death a homicide. *Id.* ¶¶ 45, 47. She concluded that Smith had died of "sudden cardiac arrest while restrained," which had been complicated by "acute cocaine toxicity." *Id.* Dr. Osbourne also determined that the "twisting of Smith's torso was a contributing factor in his death." *Id.* ¶ 47.

On October 31, 2017, plaintiff filed her complaint. Counts I and IV both invoke 42 U.S.C. § 1983. Count I alleges that the District violated Smith's Fourth Amendment rights by commissioning "SPOs and provid[ing] them with police power[,] and knowingly and with reckless disregard . . . allow[ing] a poorly trained police officer[] to run rampant over the constitutional rights of the citizens of the District of Columbia, including Smith." Compl. ¶ 60. Count IV alleges that the District, "intentionally and with deliberate indifference," "failed to train its SPOs and officers in the proper application of force." *Id.* ¶¶ 80, 83. In her opposition to defendant's motion to dismiss, plaintiff explained that the "claim under 42 U.S.C. § 1983 against the District is best understood as alleging that the District is liable for the unconstitutional excessive force used against Alonzo Smith . . . as a result of the District's failure to adequately train the offending [SPOs] on the use of force." Pl.'s Mem. of P. & A. in Opp. to Def.'s Mot. [Dkt. # 24] ("Pl.'s

_____

2    Plaintiff lists the autopsy date as November 2, 2017, but that date was after the complaint was filed. The Court assumes that the autopsy took place one day after Smith's death, not two years later.

Opp.") at 2. Therefore, the Court will treat these counts as a single claim for damages under section 1983.

Counts II and III allege causes of action for negligence under the District of Columbia's Wrongful Death Act and Survival Act. *See* Compl. ¶¶ 61–77. Plaintiff claims that the "District owed a duty of care to ensure that the SPOs commissioned had the necessary and proper training to carry out the standard of care applicable to law enforcement," and that defendant "breached this duty of care by failing to promulgate appropriate rules, regulations, protocols, procedures, a proper training program and materials[,] and to properly train SPOs." *Id.* ¶¶ 62–63, 70, 73.

On, February 26, 2018, the District moved to dismiss plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mot. at 1; Mem. of P. & A. in Supp. of Def.'s Mot. [Dkt. # 22] ("Def.'s Mem."). The District argues that plaintiff has failed to allege sufficient facts to state a claim for failure to train under 42 U.S.C. § 1983. *See* Def.'s Mem. at 8. It also maintains that it is entitled to discretionary function immunity with regard to plaintiff's negligence claim. *Id.* at 10.[3] Plaintiff opposed the motion on March 12, 2018, Pl.'s Opp., and the District replied on March 19, 2018. Reply to Pl.'s Opp. [Dkt. # 26] ("Def.'s Reply").

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v.*

---

3    The District originally advanced one additional argument: that plaintiff's Wrongful Death Act claim should be dismissed for failure to comply with the one year statute of limitations. *See* Def.'s Mem. at 12. However, plaintiff correctly pointed out that the statute was amended, and the statute of limitations period was expanded to a period of two years. Pl.'s Opp. at 10; D.C. Code § 16-2702 ("An action pursuant to this chapter shall be brought by and in the name of the personal representative of the deceased person, and within 2 years after the death of the person injured."). In its reply, defendant acknowledged the statute's amendment, and it withdrew this argument since plaintiff's claims were timely filed. Def.'s Reply at 5.

*Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id*., quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242

(D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

## ANALYSIS

**I.**      **The Court will grant the District's motion to dismiss plaintiff's section 1983 claim.**

**A.**      **Municipal Liability under 42 U.S.C. § 1983**

Section 1983 of the Civil Rights Act provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

To establish that a municipality is liable under section 1983, a plaintiff must prove both "a predicate constitutional violation" and "that a custom or policy of the municipality caused the violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003), citing *Collins v. City of Harker Heights*, 503 U.S. 115, 124 (1992); *see also Monell*, 436 U.S. at 690.

Here, the District concedes that plaintiff's complaint sufficiently alleges that SPOs Wilson and Vega violated Smith's Fourth Amendment rights. Def.'s Mem. at 8 n.2. Therefore, the Court only needs to analyze the causation issue.

A municipality cannot be held liable for the unconstitutional conduct of its employees based on a theory of *respondeat superior*: "Instead, it is when execution of a government's policy

or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell*, 436 U.S. at 691, 694; *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (noting that "while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*") (emphasis in original) (citation omitted).

As a result, "[p]laintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60 (2011), quoting *Monell*, 436 U.S. at 691; *see also Monell*, 436 U.S. at 694 (stating that the policy must be "the moving force of the constitutional violation").  The D.C. Circuit has explained:

> There are a number of ways in which a "policy" can be set by a municipality to cause it to be liable under § 1983: the explicit setting of a policy by the government that violates the Constitution; the action of a policy maker within the government; the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become "custom"; or the failure of the government to respond to a need (for example, training of employees) in such a manner as to show "deliberate indifference" to the risk that not addressing the need will result in constitutional violations.

*Baker*, 326 F.3d at 1306 (internal citations omitted).

Here, plaintiff alleges that the District's failure to train the SPOs on the proper use of force amounted to deliberate indifference toward Smith's constitutional rights, and, therefore, the District is liable under 42 U.S.C. § 1983.  Compl. ¶¶ 80, 83–85.

## B.     Failure to Train

"[A] local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. But the Supreme Court has made it clear that a municipality will only be held liable in "limited circumstances," because "culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* To constitute a "policy or custom" that is actionable under section 1983, a municipality's failure to train its employees must amount to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.*, quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (internal edits omitted).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61, quoting *Bd. of. Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "[W]hen city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.* at 62, citing *Brown*, 520 U.S. at 407; *see also Warren v. District of Columbia*, 353 F.3d 36, 38 (D.C. Cir. 2004) (observing that deliberate indifference "is an objective standard . . . simply mean[ing] that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction"), citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1994). Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62, quoting *Brown*, 520 U.S. at 409. There may be rare circumstances in which "the unconstitutional consequences of

failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. In either scenario, plaintiff also bears the burden of proving that the lack of training actually caused the violation in question. *See Harris*, 489 U.S. at 391 ("[F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury.").

While plaintiff has alleged in conclusory terms that the District failed to adequately train the SPOs regarding the use of force, she has set forth no facts indicating that the District's decision makers knew or should have known of any deficiencies in the training that would support a finding that the District was "deliberately indifferent" toward citizens' constitutional rights. *See Connick*, 563 U.S. at 61–62.

The complaint summarily alleges that the District "acted intentionally and with deliberate indifference to the rights of Smith and other persons" by "fail[ing] to appoint, supervise, monitor, train, and/or promote SPO[s] . . . who would enforce the laws in effect in the District of Columbia," and that the District "failed to train its SPOs and officers in the proper application of force." Compl. ¶¶ 80, 83. Plaintiff claims that the District "had both actual and constructive knowledge that the SPOs of the District of Columbia Metropolitan Police Department[] engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to Smith and other persons," *id.* ¶ 81, and that the District failed to do anything "after having constructive notice regarding the widespread abuse of persons' rights" by the SPOs. *Id.* ¶ 82. She also alleges that the District had "sufficient notice that further training and changes to training manuals were necessary" based on the "number and frequency [of] SPOs' use of excessive force." *Id.* ¶ 83.

But plaintiff does not specify a single incident that supposedly alerted the District to a problem. Thus, defendant contends that plaintiff's allegations are too conclusory to state a claim

under section 1983, *see* Def.'s Mem. at 8–9, and the Court agrees. Plaintiff's complaint is devoid of the facts necessary to support a reasonable inference that the District was on notice of a problem with SPO training, and there are no facts to support the element of causation either.

The complaint describes one incident involving the alleged use of excessive force – the arrest of Smith. While plaintiff posits that there was a "pattern" of SPOs using excessive force of which the District had "knowledge," *see* Compl. ¶¶ 81, 83, she has not pled any *facts* that would demonstrate a pattern of unconstitutional conduct by SPOs. Plaintiff has not pointed to other complaints filed with MPD, or other lawsuits against the District based on similar excessive force claims. Moreover, plaintiff has not supplied any facts to show that the District knew or should have known of any problems, much less a pattern of problems, involving SPOs, who are employed by private entities. *See* D.C. Code § 5-129.02(a)–(b). The complaint is simply "a formulaic recitation of the elements of a cause of action," *Iqbal*, 556 U.S. at 678, quoting *Twombly*, 550 U.S. at 555, and that is insufficient to state a claim. *See Bell v. District of Columbia*, 82 F. Supp. 3d 151, 157 (D.D.C. 2015) (dismissing a failure to train claim under section 1983 against the District where the complaint parroted the elements of a deliberate indifference theory by stating, "[t]he District of Columbia acted . . . with deliberate indifference to the safety of the citizens of the District by failing to properly train, supervise, control, direct, monitor and discipline its officers in their duties and responsibilities"). Furthermore, the complaint is completely devoid of any factual allegations that would establish the necessary element that it was the alleged deficiency in the training program that caused the constitutional violation here.

Plaintiff argues that even if the Court finds that the complaint does not include "sufficiently pleaded facts as to the District's ignoring of a history of constitutional violations," the complaint should survive defendant's motion to dismiss because "a pattern of similar violations is not always

necessary to show deliberate indifference as applied to necessary training." Pl.'s Opp. at 5–6, citing *Harris*, 489 U.S. at 390 & n.10. But plaintiff's reliance on the Supreme Court's observation in *Harris* is misplaced. In *Harris*, the Supreme Court recognized that a municipality's failure to provide any training on an issue that would obviously necessitate training – such as an officer's use of firearms, and in particular, deadly force – could possibly demonstrate a municipality's deliberate indifference. *Id.*[4] But here, plaintiff has not alleged that the District provides no training to SPOs on the use of excessive force. Rather, the complaint states that the District provides SPOs with sixteen hours of pre-assignment training that includes specific instruction on the use of force, and that the training is supplemented by another sixteen hours of on-the-job training. *See* Compl. ¶¶ 25–26.[5]

Because plaintiff does not allege that the District failed to provide *any* training on the use of force, plaintiff's claim is not analogous to the potential "single-incident" theory of liability that

---

4      In *Harris*, the Supreme Court hypothesized a situation where proof of a pre-existing pattern would not be necessary to hold a municipality liable under section 1983:

> For example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

> It could also be that the police, in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers, who, nevertheless, are "deliberately indifferent" to the need.

*Harris*, 489 U.S. at 390 n.10 (internal citation omitted).

5      Indeed, plaintiff suggests that the SPOs disregarded their training when arresting Smith. *See* Compl. ¶¶ 29–31, 40 (alleging that "SPOs are trained to use the least amount of force that is necessary to control the situation" and that the "conduct and tactics used by both Wilson and Vega are in direct violation of proper procedures and protocols for the use of force").

was described in *Harris.  See Odom v. District of Columbia*, 248 F. Supp. 3d 260, 268 (D.D.C. 2017) (holding that the plaintiff did not state a claim under *Harris* because the plaintiffs "do not allege that the District fails to provide *any* training on the use of force") (emphasis in original). Instead, as the court concluded in the *Odom* case, plaintiff's claim "requires pleading additional facts that would demonstrate that the training was insufficient and that the District knew or should have known that the training was insufficient."  *Id.*

Therefore, plaintiff has not pleaded sufficient factual content to plausibly show that the District was deliberately indifferent to an inadequacy in its training, or that the inadequate training had some connection to the events that led to Smith's death.  So, the Court will dismiss the section 1983 claim against the District without prejudice.

## II.     The Court will also dismiss the negligence claims in Counts II and III under the D.C. Wrongful Death Act and D.C. Survival Act.

When "a defendant's allegedly negligent conduct results in death, plaintiffs in D.C. may pursue two independent claims:  wrongful death claims and survival claims."  *Casey v. McDonald's Corp.*, 880 F.3d 564, 570 (D.C. Cir. 2018).  Plaintiff is pursuing both claims under the relevant provisions of the D.C. Code.  D.C. Code § 16-2701 (wrongful death); D.C. Code § 12-101 (survival action). "[N]either statute provides any substantive rights; they simply establish the

procedural methods for filing suit." *Buruca v. District of Columbia*, 902 F. Supp. 2d 75, 87

(D.D.C. 2012), citing *Runyon v. District of Columbia*, 463 F.2d 1319, 1321 (D.C. Cir. 1972).[6]

The District maintains that it is immune from plaintiff's negligence claims arising under

D.C. law because it is entitled to discretionary function immunity, *see* Def.'s Mem. at 10–12, and

the claims will be dismissed for that reason.

In the District of Columbia, "the doctrine of sovereign immunity acts as a bar to bringing

suit against the District of Columbia for its discretionary functions." *Nealon v. District of*

*Columbia*, 669 A.2d 685, 690 (D.C. 1995), citing *Powell v. District of Columbia*, 602 A.2d 1123,

1126 (D.C. 1992). This "governmental immunity depend[s] on the ministerial-discretionary

---

6     In a wrongful death action, the decedent's next of kin or spouse may recover economic losses resulting from the death of a loved one. D.C. Code § 16-2701; *see Casey*, 880 F.3d at 570; *Semler v. Psychiatric Inst. of Wash. D.C., Inc.*, 575 F.2d 922, 925–26 (D.C. Cir. 1978) (observing that the Wrongful Death Act "is designed to provide a remedy whereby close relatives of the deceased, who might naturally have expected maintenance or assistance from the deceased had he lived, may recover compensation from the wrongdoer commensurate with the loss sustained"). A decedent's personal representative may file suit on behalf of the decedent's next of kin, as plaintiff clearly did here. *See Runyon*, 463 F.2d at 1321 (recognizing that a deceased's spouse and next of kin may recover if the "personal representative of [the] deceased's estate prevails [on] their behalf in the wrongful death action established by statute"). The damages a plaintiff can recover under the Wrongful Death Act are somewhat limited, but they include a share of the decedent's expected earnings, as well as the costs of "reasonable" burial expenses. *See* D.C. Code § 16-2701(b); *see also Robinson v. District of Columbia*, 130 F. Supp. 3d 180, 188 (D.D.C. 2015) (describing the variety of damages). However, the Act does not allow a plaintiff to recover for grief or emotional distress. *See* D.C. Code § 16-2701(b); *Runyon*, 463 F.2d at 1322.
      In comparison, "[i]n a survival action, a representative of the decedent may bring a tort cause of action that the decedent could have pursued if he or she had survived." *Casey*, 880 F.3d at 570; D.C. Code § 12-101. A survival action is designed to benefit the decedent's estate, and to "place the deceased's estate in the position it would have been in had the deceased's life not been cut short." *Semler*, 575 F.2d at 925; *see Runyon*, 463 F.2d at 1321 ("The first is the interest of the deceased in the security of his person and property. The personal representative of the estate of [the] deceased may bring an action on behalf of the estate to recover for the invasion of that interest."), citing D.C. Code § 12-101. Recovery under the Survival Act "is based on the probable net future earnings reduced by the amount [the] deceased would have used to maintain himself and those entitled to recover under the Wrongful Death Act." *Semler*, 575 F.2d at 925. Further, the personal representative may recover damages for the deceased's pain and suffering. *Robinson*, 130 F. Supp. 3d at 188, citing *Burton v. United States*, 668 F. Supp. 2d 86, 110 (D.D.C. 2009).

dichotomy." *Biscoe v. Arlington Cty.*, 738 F.2d 1352, 1362 (D.C. Cir. 1984); *see Casco Marina Dev., LLC v. D.C. Redevelopment Agency*, 834 A.2d 77, 81 (D.C. 2003) ("To determine whether the District is immune to liability, we have long relied upon the 'ministerial-discretionary' test."), quoting *Wade v. District of Columbia*, 310 A.2d 857, 860 (D.C. 1973). In other words, "[t]he question of whether immunity is available under the doctrine turns upon whether the act complained of was discretionary or ministerial." *Nealon*, 669 A.2d at 690.

"The term ministerial 'connotes the execution of policy as distinct from its formulation,'" which would be a discretionary act. *Biscoe*, 738 F.2d at 1362, quoting *Elgin v. District of Columbia*, 337 F.2d 152, 154–55 (D.C. Cir. 1964). "Discretionary acts have . . . been defined as acts that require 'personal deliberation, decision and judgment,'" whereas "ministerial acts . . . generally constitute 'mere obedience to orders or performance of a duty in which the [municipal employee] has little or no choice.'" *Nealon*, 669 A.2d at 690, quoting 18 E. McQuillin, Municipal Corporations § 53.22.10, at 274 (3d ed. 1984) (alterations in original).

Defendant argues that the design of the District's training program "necessarily involves discretionary decisions by officials of the Metropolitan Police Department regarding the appropriate level of training of SPOs and therefore is immune from judicial review." Def.'s Mem. at 11. But plaintiff maintains that once the District made the decision that it was going to deploy SPOs and train them, the acts of training and supervising them became mere ministerial functions that are not shielded by immunity. Pl.'s Opp. at 9.

In support of her position that training police officers is a ministerial task, plaintiff relies heavily on a non-binding district court opinion, *Thomas v. Johnson*, 295 F. Supp. 1025 (D.D.C. 1968) and the D.C. Circuit's decision in *Biscoe v. Arlington County*, 738 F.2d 1352 (D.C. Cir. 1984). *See* Pl.'s Opp. at 8–10. But the principles articulated in those decisions do not apply here.

In *Thomas*, the plaintiff alleged that the defendant, an individual police officer, "drank on duty, used racial epithets[,] and toyed with his baton in congested areas," and that the officer hit him with the baton and caused him injury. 295 F. Supp. at 1026, 1031. The plaintiff claimed that the District was on notice of multiple complaints against the officer, and that his injuries were "the 'proximate result' of [d]efendant District of Columbia's negligent failure to respond to these complaints." *Id.* at 1031. The complaint alleged claims of "assault and battery, negligence[,] and deprivation of civil rights." *Id.* at 1026.

In determining whether the District was immune from suit, the court posed the broad question of "whether the operation of the force, including training, instruction, supervision and control of police officers, is a discretionary or a ministerial function of a municipal government." *Thomas*, 295 F. Supp. at 1030. It observed that there is no clear statement under D.C. law on the issue. *Id.* Faced with a complaint alleging negligent supervision of an individual officer, the court applied a principle distilled from cases in other jurisdictions: that "the tasks of supervising and instructing officers are ministerial, not discretionary acts" because "they do not involve the kind of policy-formulating, judgment-making processes encompassed by the term 'discretionary.'" *Id.* at 1030–31. The court explained:

> Once the decisions have been made to have a police department, to organize it in a particular way, and to hire a specific individual to be a member of that department, the acts of training, instructing, supervising and controlling the individual officer are merely "ministerial." When the negligence of the municipality in the performance of these ministerial functions, then, is the proximate cause of injury to a citizen, the municipality is not immune from suit and will be held liable in tort.

*Id.* at 1031. Thus, the decision in the *Thomas* case was limited to the specific context from which it emerged: the training and oversight of a particular individual, and not the development of a department-wide training protocol.

Other courts have recognized this distinction. "Clearly, the decision as to the type of training, the content of instruction, and the form of supervision are discretionary decisions. Once those decisions are made, the negligent failure to supervise a particular officer may be 'ministerial,' but the decision that supervision shall take a particular form is not." *Dodge v. Stine*, 739 F.2d 1279, 1284 (7th Cir. 1984) (rejecting *Thomas* and holding that "the decision on what policy to follow in conducting high speed chases, and whether to put that policy in writing, is discretionary and not subject to judicial review"); *see also Cox v. District of Columbia*, No. 91-2004, 1991 WL 258173, at *4 (D.D.C. Nov. 22, 1991) (concluding that the District of Columbia and its officials were immune from suit because "provid[ing] adequate training . . . falls squarely within the discretionary domain," and noting that the complaint "challenges the 'adequacy' and extent of training," not how the officials "carr[ied] out these duties") (first alternation in original).[7]

In *Biscoe*, the plaintiff was an innocent bystander who was severely injured when he was struck by a vehicle being pursued into the District by an Arlington County police officer. 738 F.2d at 1355. He and his wife sued the officer and the Arlington police department. *Id.* The jury found the officer liable for negligence in his conduct of an initial stop that took place on the bridge between Virginia and D.C. from which the suspect was able to flee, and in his high-speed pursuit of the suspect into the city thereafter. *Id.* at 1356. It found the county liable for negligence on a

---

[7]     While the District of Columbia may be entitled to absolute immunity from suit, the test for determining if an official is immune includes a few other inquiries in addition to the question of whether an act is discretionary or ministerial. Immunity is available to government officials "when (1) the official acted within the 'outer perimeter' of his official duties, and (2) the particular government function at issue was 'discretionary' as opposed to ministerial.'" *Moss v. Stockard*, 580 A.2d 1011, 1020 (D.C. 1990), citing *District of Columbia v. Thompson*, 570 A.2d 277, 294 & n.14 (D.C. 1990), *vacated in part by* 593 A.2d 621. In distinguishing discretionary acts from ministerial ones, courts are directed to consider four policy factors: "(1) the nature of the injury, (2) the availability of alternate remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts." *Id.* at 1021 (footnote omitted), citing *Thompson*, 570 A.2d at 297.

*respondeat superior* theory and also for its own negligence in supervising and training the officer. *Id.*

The defendants raised a number of issues on appeal, and of relevance to this case, they challenged the trial court's finding that neither defendant was entitled to discretionary function immunity. *Id.* at 1356–63.

The Court of Appeals agreed with the lower court's determination.

> We believe the actions at issue were clearly ministerial and operational . . . . In the District of Columbia, both official and governmental immunity depend on the ministerial-discretionary dichotomy. The term ministerial "connotes the execution of policy as distinct from its formulation." In contrast, "[i]f policy considerations were involved and no statutory or regulatory requirements limited the exercise of policy discretion, immunity would bar suit."

*Id.* at 1362 (internal citations and edits omitted).

The Court emphasized that the individual officer conducting the chase was bound by both regulations and departmental policy, and it found that the exercise of his independent judgment on the scene was therefore quite circumscribed. *Id.* at 1363. So, according to the Court of Appeals, his acts were plainly ministerial in nature, and he was not entitled to immunity. *Id.* ("We therefore need not be concerned that tort liability for such operational actions would 'pose threats to the quality and efficiency of government.'"), quoting *Spencer v. Gen. Hosp.*, 425 F.2d 479, 482 (D.C. Cir. 1969) (en banc).

The Court said little about the claims against the county specifically. But with respect to the verdicts against both defendants, it stated:

> Under existing precedent in this Circuit, we have no doubt that the activities at issue here – supervising and instructing officers, conducting a felony stop, and conducting a felony pursuit – are ministerial, not discretionary, acts. They involve day-to-day operational matters, not planning and policy.

*Id.* It also repeated the statement in *Thomas* that "[f]rom the very nature of these activities, it is clear that they do not involve the kind of policy-formulating, judgment-making processes encompassed by the term 'discretionary.'" *Id.*, quoting *Thomas*, 295 F. Supp. at 1031.

But this reasoning does not necessarily extend to the initial design of a training program by a municipality. Indeed, the *Biscoe* Court specifically cautioned: "[o]f course, not all actions having to do with training police officers are necessarily operational or ministerial." 738 F.2d at 1363 n.7; *see also Carter v. Carlson*, 447 F.2d 358, 363–64 (D.C. Cir. 1971), *rev'd in part on other grounds*, 409 U.S. 418 (1973) ("The functions of training, supervising, and controlling police officers subsume a variety of distinct duties, conceivably incumbent in some degree on a variety of police personnel. No doubt some of these duties should be regarded as discretionary for the purposes of official immunity, but others are clearly ministerial for that purpose."). Thus, the issue to be resolved is whether this complaint alleges flaws in the District's day-to-day oversight of SPO operations – the *execution* of rules and policies – or whether it complains of deficiencies in the *development* of municipal policy.

Plaintiff's complaint alleges that the District breached its duty of care by "failing to promulgate appropriate rules, regulations, [and] protocol[s]," and by "only allocating a mere 16 hours of training to the use of reasonable force for commissioned SPO officers." Compl. ¶¶ 63, 73. Thus, the gravamen of the complaint is that the District was negligent when it designed its training program on the use of excessive force. Therefore, this case falls outside the holding in *Biscoe* because the programmatic and policy decisions that go into creating a training program and determining the appropriate number of hours to devote to each topic are discretionary decisions – judgment calls – and not ministerial tasks. The complex choices the District makes

regarding the training of SPOs are precisely the sort of decisions the discretionary function exception was designed to protect.[8]  As the D.C. Circuit observed in *Burkhart v. WMATA*,

> [t]he extent of training with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past. Such decisions are surely among those involving the exercise of political, social, or economic judgment.

112 F.3d 1207, 1217 (D.C. Cir. 1997);[9] *see also Cox*, 1991 WL 258173, at *4.

---

[8]     This conclusion is consistent with the holdings of the D.C. Court of Appeals that "planning and design are discretionary functions." *District of Columbia v. Pace*, 498 A.2d 226, 229–30 (D.C. 1985) (holding that the "District's decision on whether to establish a plan of [freeway] improvement is within the area protected by sovereign immunity"); *see also Rustin v. District of Columbia*, 491 A.2d 496, 500 (D.C. 1985) ("The activities at issue here," such as "the Mayor's request for a legal opinion on the proper construction and application of District regulations . . . involve policy formulation and judgment-making processes," and "it is clear that these actions are discretionary in nature").  This is so because a "city's setting of priorities so that its limited resources can be most effectively allocated to protect the public is a matter of discretion." *Pace*, 498 A.2d at 230, citing *Morgan v. District of Columbia*, 468 A.2d 1306, 1311 (D.C. 1983); *see Nealon*, 669 A.2d at 689–91 (finding that the District's decision to reduce water pressure in fire hydrants was discretionary because it "reflect[ed] policy decisions of government officials," including "the District's allocation of financial or natural resources"); *Chandler v. District of Columbia*, 404 A.2d 964 (D.C. 1979) (holding that the city's decision to close certain fire stations to save money constituted a discretionary act).

[9]     The District maintains that *Burkhart v. WMATA*, 112 F.3d 1207 (D.C. Cir. 1997) "is controlling authority here." Def.'s Reply at 5.  While the Court finds this case to be persuasive since it involves the evaluation of the discretionary nature of creating a training program, the case involves the application of the discretionary-ministerial dichotomy under the Federal Torts Claims Act. *See Burkhart*, 112 F.3d at 1216.  As the Circuit explained in *Burkhart*, WMATA is governed by the "WMATA Compact," which provides that WMATA shall be liable "for its torts and those of its Directors, officers, employees and agents committed in the course of any proprietary function . . . but shall not be liable for any torts occurring in the performance of a governmental function." *Id.* (omission in original), quoting D.C. Code § 1-2431(80).  Due to the existence of this statutory provision, federal courts have developed "two alternative tests for identifying 'governmental' functions under the WMATA Compact." *Id.*, citing *Dant v. District of Columbia*, 829 F.2d 69 (D.C. Cir. 1987).  "If an activity is a 'quintessential governmental' function, such as 'police activity,' it is within the scope of WMATA's sovereign immunity." *Id.* (alterations in original), quoting *Dant*, 829 F.2d at 74.  However, for any other functions, "immunity will depend on whether the activity is 'discretionary' or 'ministerial,' a dichotomy employed by the Federal Torts Claims Act ('FTCA')." *Id.*, citing 28 U.S.C. § 1346(b).  [Continued on next page].

Therefore, the District is entitled to immunity, and the Court will dismiss Counts II and III against the District.

## CONCLUSION

For the foregoing reasons, the Court will grant the District's motion to dismiss in its entirety; Counts I and IV against the District will be dismissed without prejudice.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 7, 2018

---

[Continued from previous page]. The plaintiff in *Burkhart* cited the D.C. Circuit's opinion in *Biscoe* to support his argument that supervising and instructing employees is a ministerial function. 112 F.3d at 1216. But the Court pointed out that the Supreme Court has held "that discretionary activity, for purposes of the FTCA, can include operational activities," and thus the Court was not bound by the "discretionary/ministerial distinction in *Biscoe*" since it had been repudiated in the context of the FTCA. *Id.*, citing *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (holding that federal regulators' supervision of savings and loan association's day-to-day activities involved the exercise of discretion under the FTCA). However, the Court confirmed that *Biscoe* was still controlling precedent "as to the definition of ministerial and discretionary activities under District of Columbia law." *Id.* Ultimately, the *Burkhart* Court concluded that, under the FTCA, "decisions concerning the hiring, training, and supervising of WMATA employees are discretionary in nature, and thus immune from judicial review." *Id.* at 1217. And since the discretionary-ministerial test under D.C. law and the FTCA are similar, the Court finds *Burkhart* persuasive authority on the subject, especially in light of the dearth of relevant case law under D.C. law involving the formulation of training programs.